**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**
_____

KEITH AYOUB,

       Plaintiff,

    v.                                  No. 1:12-CV-00909 WJ/LFG

BOARD OF COUNTY COMMISSIONERS
FOR THE COUNTY OF SANTA FE, NEW
MEXICO; and KATHERINE MILLER,
Individually and in her official capacity as
County Manager,

       Defendants.

<u>**MEMORANDUM OPINION AND ORDER**</u>
<u>**GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT,**</u>
<u>**and**</u>
<u>**DENYING PLAINTIFF'S MOTION FOR LEAVE TO FILE SURREPLY**</u>

THIS MATTER comes before the Court upon Defendants' Motion for Summary Judgment, filed May 14, 2013 (**Doc. 37**), and Plaintiff's Motion for Leave to File Surreply, filed July 24, 2013 (**Doc. 49**). Having reviewed the parties' briefs and applicable law, I find that Defendants' motion for summary judgment is granted, and Plaintiff's motion for leave to file a surreply is denied.

**<u>BACKGROUND</u>**

Plaintiff was employed as a detention officer ("corrections officer") with Santa Fe County. His amended complaint (Doc. 13) alleges a single count against his former employer: a violation of the Uniformed Services Employment and Reemployment Rights Act of 1994, 38 U.S.C. § 4301 et seq. ("USERRA"), when his employer terminated his employment on

November 2, 2011.  Plaintiff contends that almost immediately upon advising his supervisors

that he was enlisting in the Army, he was terminated under the pretext that he had not completed

training that he had in fact already been certified as completing at Defendant's training academy.

Defendants contend that Plaintiff was terminated for legitimate, nondiscriminatory reasons

unrelated to USEERA – refusing to participate in a required training exercise and abandoning his

post.  At the time of his termination, Plaintiff was a probationary employee and could be

terminated for any reason.

Before turning to the merits of Plaintiff's USERRA claim, the Court addresses Plaintiff's

objections to certain exhibits presented by Defendants, and Plaintiff's request to file a surreply.

## DISCUSSION

### I.        Plaintiff's Objections to Exhibits F, G, H and I and Deposition Testimony

Plaintiff objects to Defendants' Exhibits F, G, H, and I because they are hearsay and

therefore not admissible for purposes of Fed.R.Civ.P. 56.  *See Wright-Simmons v. City of

Oklahoma City*, 155 F.3d 1264, 1268 (10th Cir. 1998) (hearsay testimony, whether in an exhibit,

affidavit or document, cannot be used to defeat a motion for summary judgment).  After

reviewing the exhibits and the parties' arguments, the Court overrules Plaintiff's objections to

these exhibits.

Exhibit F is a Training Roster, which is a record of the training completed by the Santa

Fe County employees who worked at the Santa Fe detention facility, and which indicates that

Plaintiff did not complete training for exposure to chemical agents.  Exhibit G is a letter dated

October 26, 2011 from Sergeant Valdez informing David Trujillo, the Warden, that Plaintiff

failed to complete the chemical agent exposure training, was advised he would have to retake it,

and refused to be exposed at the October 25, 2011 recertification.  Exhibit H is a letter from

2

Annabelle Romero, the Corrections Officer, to the County Manager dated October 28, 2011 and requesting Plaintiff's termination.  Exhibit I is Plaintiff's termination letter issued by the County Manager on November 2, 2011.

Defendants have submitted evidence which shows that Exhibit F, the Training Roster, is maintained by the Training Department in the ordinary course of business, and is therefore an exception to the hearsay rule.  *See* Ex. J.  The Court agrees with Defendants that Plaintiff's authentication objections to Exhibits G, H and I are somewhat surprising, given that all of these exhibits are part of the Plaintiff's personnel file which document the County's reasons why he was terminated and who participated in that decision.  At any rate, Defendants have provided an affidavit of the business custodian of the County, and thus these exhibits are admissible for summary judgment purposes under Fed.R.Evid. 803(C).

Plaintiff's hearsay objections to Wade Ellis' deposition testimony, offered to assert that Plaintiff did not pass the chemical exposure training course and for what occurred in the October 25th training class, are overruled.  Defendants are offering his testimony to show why Lieutenant Ellis spoke with Plaintiff about the need for him to complete the exposure drill.  Because the testimony is not offered as evidence that Plaintiff did not complete the drill, Lieutenant Ellis may rely on accounts from others in order to explain the reason for his approaching Plaintiff about recertification.

## II.     Plaintiff's Motion for Leave to File Surreply (Doc. 49)

Plaintiff seeks leave to file a surreply to respond to what he claims are new arguments raised by Defendants in their response.  In light of the Court's disposition of this request, the Court did not find it necessary to wait for Defendants' response before making a decision.

The "new" arguments relate to Plaintiff's retaliation claim.  Plaintiff contends that Defendants are asserting "for the first time" that Plaintiff's protected activity is not his formal enlistment, but his first discussions about his interest in enlisting in the Army.  The Court does not agree that Defendants raised a "new" argument in the reply; rather, they responded to Plaintiff's position that the "protected activity" was limited to Plaintiff's formal enlistment.  If the "protected activity" was considered Plaintiff's first discussions about enlisting (as Defendants additionally propose), there would be insufficient temporal proximity to connect the activity to the alleged adverse action.

Plaintiff also contends that Defendants attempt to "recast" Plaintiff's complaint by presenting "new argument" on the issue of whether temporal proximity alone defeats summary judgment, where there is no evidence of pretext.  The Court does not view Defendants' arguments on the temporal proximity issue as "recasting."  Defendants are simply applying the law of this circuit regarding discrimination claims to the facts of the case.  Further, the reply responds to Plaintiff's own arguments regarding pretext.  Doc. 42 at 18 ("Evidence of Pretext").  Certainly, Defendants have the right to argue the absence of pretext where Plaintiff argues the opposite.  Thus, the Court does not find that the reply raises any new issues or contains any new arguments.

The Court denies Plaintiff's motion to file a surreply, mainly because the Court's rulings do not rely on any of the "new arguments" raised by Defendants.[1]  Further, even if the Court did rely on these matters, the proposed surreply is useless for several reasons.  First, it does not develop any of the issues which Plaintiff claims are raised for the first time in the reply.  Second, the proposed surreply appears to be merely an opportunity for Plaintiff to reiterate his version of

---

[1]  Where a reply contains new material or argument, courts must either refrain from relying on the new material or argument in ruling on the motion, or permit a surreply.  *See Beaird v. Seagate Tech., Inc.,* 145 F.3d 1159 (10th Cir. 1998).

the facts, and his response to Defendants' statement of the facts.  For example, Plaintiff states in the proposed surreply that "Plaintiff's 'satisfactory' completion of the chemical exposure drill is very much in dispute. . . ."  Doc. 49-1, ¶ 2.  Plaintiff also states that he "was not given notice of a 'second opportunity' to pass the chemical exposure by being told to attend a recertification class."  *Id.*, ¶ 3.  These matters have already been addressed in the parties' briefing, and Plaintiff has already had the opportunity to respond to Defendants' statement of undisputed facts.  Accordingly, the Court Plaintiff's motion to file a surreply is DENIED.

## III.    Undisputed Facts[2]

Plaintiff was hired as a corrections officer for Santa Fe County on January 31, 2011. His employment was terminated on November 2, 2011 while he was still a probationary employee.  Plaintiff had previous experience as a corrections officer for Sandoval County, having worked there from November of 2004 to August of 2010.  He reports that he resigned from that job because he did not want to be a corrections officer any longer.  Nevertheless, he applied to Santa Fe County in that same capacity and began work on January 31, 2011.[3]

###    A.    Initial Academy Training

Plaintiff was required to attend 280 hours of training at Santa Fe County's Academy for correctional officers.  This training consisted of several areas of instruction, including defensive tactics, segregation procedures, use of force, first aid, defensive driving, and chemical agents.  Certification by the County for the correctional officer program requires completion of a mandatory chemical training exposure drill.  Plaintiff, along with the rest of his recruitment

---

[2]   The following facts are undisputed unless otherwise noted.  Many of Plaintiff's presented factual "disputes" are either irrelevant or immaterial.  For ease of reading, the Court includes these "disputes" in footnotes where possible.  The facts presented here are supported by evidence submitted in the parties' exhibits, unless otherwise noted.
[3]   The Court disagrees with Plaintiff that his previous employment with Sandoval County is immaterial to this case.  Plaintiff's own statements concerning his prior employment and his reasons for leaving are relevant to Plaintiff's failure to follow through on the chemical exposure drill, and to his reluctance to continue working as a corrections officer.  Also, Plaintiff's reluctance to complete the chemical exposure drill is central to Defendants' asserted legitimate reasons for terminating him.

class, was required to attend a chemical exposure training course, which consists of a lecture/test portion and a chemical exposure portion.  All correctional officers are required to be sprayed in the face with pepper spray (oleoresin capsicum or "OC") and to show that they are capable of performing what is known as a failure drill.  This drill consists of proceeding forward to perform elbow strikes and knee strikes on a heavy bag and then apply handcuffs.  Sergeant Francisco Valdez was the training officer who instructed the training course that day.

Plaintiff was able to complete the didactic portion of the chemical exposure course, but became incapacitated and was unable to complete the chemical exposure portion.  Plaintiff testified that he "was literally trying to pull [his] eyes open because [he] couldn't physically do it."  Ex. C at 50:10-12.  At that point, he was escorted over to the water fountain where he rinsed the chemical from his eyes, and was told by Sergeant Valdez, "Okay, you're done."  Ex. C at 50:12-13.  Despite the fact that Plaintiff did not fully complete the chemical exposure training, he was allowed to assume the duties of a corrections officer.  The employee training roster did not list Plaintiff as having completed the course, and he was required to retake the test at a later time.

Plaintiff attempts to dispute Defendants' Statements of Fact Nos. 7 and 8 which state (1) that Plaintiff did not fully complete the chemical exposure training; (2) that recruits were sometimes allowed to pass even though they did not complete all the training; and (3) that Plaintiff was required to retake the test at a later time.  Plaintiff fails to offer evidence to rebut any of those facts.  First, Plaintiff does not dispute that the chemical exposure drill includes successfully applying handcuffs while exposed to OC, and also does not dispute that he was unable to complete the handcuffing portion of the drill (see Ex. C at 50:16-17).  While Plaintiff insists he was sprayed with chemical agents in the academy during training (Ex. C at 59:9-10),

he overlooks the fact that merely being sprayed with OC without applying handcuffs during the exposure still leaves the exercise unfinished.  Therefore, Plaintiff does not and cannot dispute Defendant's factual statement that Plaintiff did not complete the chemical exposure drill while in training.

Second, Plaintiff challenges Defendants' factual explanation that a recruit who has successfully completed most of the required training may nevertheless be allowed to become a sworn officer provided that he corrects that deficiency as soon as possible.  Plaintiff attempts to create a dispute of fact by offering as exhibits a copy of the training certificate and signed officer's oath (Exs. 1 & 2).  However, this evidence is thoroughly consistent with Defendants' Statement of Fact No. 9, which explains the Corrections Department's practice of allowing some recruits to become a sworn officer, subject to retaking the training portions that were not completed, in order to maximize retention.  Defendants point out that Plaintiff was an example of passing a recruit even though he did not complete the chemical exposure portion of the training. Plaintiff argues that the cited testimony of Lieutenant Wade Ellis, who Plaintiff's shift supervisor, does not support these statements. Defendants concede that they erroneously cited to Lieutenant Ellis' deposition pages, and provide the correct cite in their reply.  Doc. 45 at 8. However, the corrected page numbers (pages 17-18) are nowhere to be found in Lieutenant Ellis' deposition exhibit (Ex. D).[4]  Nevertheless, Exhibit D does contain some testimony by Lieutenant Ellis stating that the reason Plaintiff was given a chance to avoid disciplinary action by retaking the class was the department's concern for retention.  Thus, the Court finds that Lieutenant Ellis' deposition testimony supports Defendants' Statement of Fact No. 9.  The Court also finds that Plaintiff has failed to present any evidence to dispute the statement that the Corrections

---

[4]  Defendants have omitted other deposition pages which they refer to in their Reply, for example, Lieutenant Ellis' purported testimony that he moved Plaintiff to a different post to see if he liked it better, even after he knew that Plaintiff was quitting to join the Army.  *See* Doc. 45 at 7 (discussing Fact No. 2).

Department sometimes allows a recruit to become a sworn officer even though the recruit has not completed a portion of training, subject to retaking that area of training.

Third, Plaintiff does not challenge Defendants' statement of fact that he was required to retake the chemical exposure drill.  Rather, he contends that he was never *told* he would have to retake the test later.  This is simply not true, according to Plaintiff's own sworn testimony.  During the October 25, 2001 recertification class, Serlo Vigil ("Sergeant Vigil"), who was in charge of the class, told Plaintiff he was going to be sprayed in the recertification class because he hadn't completed that portion in training (Ex. C at 58:5-10).  Upon leaving the same recertification class, Plaintiff was told by Major Woulard, another of his superiors who was also attending the class, "Well, **don't do it today**.  I'll go talk to Sergeant Valdez and the warden and find out what's going on. . . ."  Ex. C. at 59:11-15 (emphasis added).  Even after Plaintiff failed to complete the exposure drill at the October 25th class, Lieutenant Ellis told him that he had arranged for Plaintiff to attend another session so that he could complete the course.  Ex. C at 62-63 1-4.  Plaintiff cannot fairly say that he was never told anything regarding having to retake the chemical exposure part of the training.  Whether he was so advised by Sergeant Valdez or someone else in his chain of command is immaterial and insufficient to dispute Defendant's statement of facts on this issue.

While a full-time employee for Santa Fe County, Plaintiff continued to actively seek enlistment in the United States Army.  He shared that fact with several of his co-workers and supervisors, most of whom had previously served in the military and/or were currently serving in the reserves.  He frequently consulted Lieutenant Ellis, who was one of his superiors, asking him for advice on what kind of unit he should be assigned to.  Lieutenant Ellis had been in the Army and still served as an instructor.  Lieutenant Ellis advised him, for example, that he should select

something that would allow him to use skills that he could use later in the civilian world unless he planned to be a career military officer.

Plaintiff does not dispute that all the superiors with whom he discussed his plans to enlist responded in a positive and encouraging way. He does not dispute Defendants' statement of fact that no one in the County attempted to discourage him whatsoever, including Lieutenant Ellis and Sergeant Valdez. Plaintiff's enlistment had been delayed due to the fact that he had to meet the minimum physical requirements for weight or fitness. Plaintiff shared this information with Lieutenant Ellis and others at Santa Fe County. On October 24, 2011 he finally met the requirements and was given his enlistment papers with a report date of about six months in the future.[5] Plaintiff stated that the supervisors that he told were "happy" for him.

B.     Recertification on October 25, 2011

On September 27, 2011, a notice was posted indicating that a recertification course in chemical exposure training was scheduled, with a list of those required to complete it, including Plaintiff. On October 25, 2011 Plaintiff reported for the chemical exposure training as required. Sergeant Vigil's understanding was that Plaintiff had been scheduled for the recertification class on October 25, 2011 because he had not completed the chemical exposure training, although Sergeant Vigil could not remember exactly who gave him this information, or whether it was Major Woulard or the Training Department.

Plaintiff was the only one who was scheduled to receive a Level I trainee level of exposure, which entailed being sprayed in the face. All the other individuals who were exposed were supervisors who were to receive a Level II or III exposure.[6] When he was told that he was

---

[5] Plaintiff was to report for duty on April 9, 2012. Ex. C at 96:6-18. He was discharged May 15, 2012, after serving in the Army for about a month. Ex. C at 102:2-11.
[6] Chemical exposure in basic training involves a "Level I" exposure which is direct contact with the chemical to the face. However, in recertification classes, officers who carry pepper spray (that is, the supervisors) are given Levels

9

next to undergo exposure, Plaintiff protested, claimed that he felt singled out from the others, and

refused to be exposed.  Plaintiff told Sergeant Vigil:

> I mean, are you just going to all of a sudden throw me here up in front of
> everybody and just spray me without any warning?  Or what's going on?  Why
> am I the only one getting sprayed?  . . . It kind of seems like you guys, for some
> reason, are putting me on display, throwing me up in front of a crowd of people
> just to spray me for some reason.

Ex. C at 58-59:1015; 24-2.

Plaintiff was dismissed from the class at that point.  However, he claims he never

"refused" to be sprayed, and that he was not actually "dismissed" from the class.  The Court

agrees with Defendants that Plaintiff's attempt to present factual disputes is an exercise in

semantics, since there is little difference between "objecting" to being exposed to OC and

"refusing" to be exposed.  There is also no difference between being told to leave, and being

dismissed.  Plaintiff's own deposition testimony describes his exit from class as a dismissal.

Woulard refused to spray Plaintiff if he was unwilling to do so, and then told Plaintiff to "clock

out and go home for the day. . . ."  Ex. C at 58:18-20; 59:15-17.

After he left the October 25th chemical exposure class, Lieutenant Ellis told Plaintiff that

he needed to complete the chemical exposure training or he would face disciplinary action.

Lieutenant Ellis then advocated for Plaintiff and arranged for Plaintiff to attend another session

so that he could complete the course.  Plaintiff said he would attend.  Plaintiff failed to appear for

the make-up session because on the date of the next training he was kept at work for overtime

duty and he could not make the class.  Plaintiff stated that he worked 6:00 p.m. to 6:00 p.m. the

---

II and III exposure which is defined, respectively, as coming into contact with someone who has been sprayed, or
coming into contact with an area or room that was exposed to the chemical.  Ex. E at 22-23 (Vigil Depo.).  Officers
who do not carry pepper spray attend only the classroom portion of the recertification class.  *Id.* at 32:18-23.
Plaintiff does not dispute the content of Sergeant Vigil's testimony, but does object to the testimony on hearsay
grounds.  The Court overrules this objection because Sergeant Vigil's testimony relates only to what his
understanding was regarding Plaintiff's presence in the class, and is clearly not for the truth of the matter asserted.

next day, but was kept on overtime until 10:00 a.m.  He was also scheduled to return to his

regular shift at 6:00 p.m. the same day of the class.  Ex. C at 63-64.

Plaintiff had been given multiple attempts to complete his training and failed to do so.[7]

He was a probationary employee throughout this period.  The training department, through a

memo by Sergeant Valdez, recommended that due to his failure to complete the course,

Plaintiff's employment be terminated. The termination recommendation was reviewed and

approved by the Corrections Director at the time, Annabelle Romero, and by the County

Manager, Katherine Miller.  Plaintiff was terminated on November 2, 2011.

Finally, Plaintiff does not dispute Defendants' Fact No. 22, which states:

> When asked at his deposition who he claimed had engaged in discrimination
> against him based on his plans to enlist in the military, Plaintiff could not identify
> anyone who possessed the necessary discriminatory animus. He just assumed it
> was discrimination because there was no other reason, according to Plaintiff.

Defs.' Statement of Fact 22 (Doc. 38).

## IV.    Legal Standards

### A.    Summary Judgment

Summary judgment is only appropriate when the pleadings, depositions, answers to

interrogatories, and admissions on file, together with any affidavits, show that there is no

genuine issue of material fact and the moving party is entitled to judgment as a matter of law.

Fed.R.Civ.P.56(c); *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009).  The moving party

bears the initial burden of showing an absence of evidence to support the nonmoving party's

case.  Once that burden is met, the nonmoving party must put forth specific facts showing that

there is a genuine issue of material fact for trial; he may not rest on mere allegations or denials in

---

[7] Plaintiff disputes Defendants' use of the phrase "multiple attempts," but again, Plaintiff engages in semantics.  It
is undisputed that Plaintiff did not complete the initial chemical exposure drill; that he did not agree to be exposed at
the October 25th class, and that he did not appear for the makeup class on October 28th.  The Court considers this to
be "multiple" chances given to Plaintiff to complete his chemical exposure training.

his own pleadings. *Anderson v. Liberty Lobby*, 477 U.S. 242, 256-57 (1986). In order to avoid summary judgment, the nonmoving party must put forth enough evidence that a reasonable jury could return a verdict in the nonmovant's favor. Id. at 249. A mere scintilla of evidence in the nonmovant's favor is not sufficient. *Id*. at 252.

      B.    <u>Statutory Text</u>

USERRA contains both a discrimination and retaliation provision. The discrimination provision states:

> (a) A person who is a member of, applies to be a member of, performs, has performed, applies to perform, or has an obligation to perform service in a uniformed service shall not be denied initial employment, reemployment, retention in employment, promotion, or any benefit of employment by an employer on the basis of that membership, application for membership, performance of service, application for service, or obligation.
> . . .
>
> (c) An employer shall be considered to have engaged in actions prohibited--
>
> (1) under subsection (a), if the person's membership, application for membership, service, application for service, or obligation for service in the uniformed services is a motivating factor in the employer's action, unless the employer can prove that the action would have been taken in the absence of such membership, application for membership, service, application for service, or obligation for service.

38 U.S.C. §4311(a); (c)(1). USERRA also provides an anti-retaliation provision, which states that:

> An employer may not discriminate in employment against or take any adverse employment action against any person because such person ... has taken an action to enforce a protection afforded any person under this chapter, . . . or . . . has exercised a right provided for in this chapter.

38 U.S.C. § 4311(b).

      C.    <u>Analytical Framework</u>

Plaintiff spends several pages discussing the framework set forth in *McDonnell-Douglas Corp. v. Green,* 411 U.S. 792 (1973), which has traditionally been used in analyzing Title VII

claims. *See St. Mary's Honor Center v. Hicks,* 509 U.S. 502 (1993) (describing *McDonnell Douglas* scheme applicable to Title VII discriminatory treatment cases). Plaintiff then urges the Court to disregard whether Plaintiff has met a prima facie case of discrimination. Doc. 42 at 5, 7 (" . . . the district court need not—and should not—decide whether the plaintiff actually made out a prima facie case under *McDonnell Douglas*"). While Plaintiff's discussion would be more on point if Plaintiff was bringing a Title VII claim, it does not clarify the specific standard applied to USERRA claims.

Defendants focus on the standard which the Tenth Circuit has applied to USERRA claims, relying on *Otero v. New Mexico Corrections Dept.,* an unpublished Tenth Circuit case. 640 F. Supp.2d 1346 (citing *Lewis v. Rite of Passage, Inc.,* 217 Fed. App'x 785, 786 (10th Cir. 2007)). *Otero* sets out the analytical framework for a USERRA claim as follows:

> In analyzing USERRA discrimination claims, the Court utilizes the evidentiary scheme for cases arising under the National Labor Relations Act . . . Initially, Plaintiff must prove "'by a preponderance of the evidence that [his or her] military service was a substantial or motivating factor in the adverse employment action.'" *Id.* . . . Plaintiff must show that Defendants "'relied on, took into account, considered, or conditioned [their] decision'" on Plaintiff's military status . . . *Id.* (quoting *Coffman v. Chugach Support Servs., Inc*., 411 F.3d 1231, 1238 (11th Cir. 2005)). "In the summary judgment context, the employee must establish a genuine issue of material fact as to whether his military status was a motivating factor in the adverse employment action to survive summary judgment." [quoted case omitted].

> To the extent Plaintiff is able to meet his initial burden, "'the burden shifts to the employer to prove the affirmative defense that legitimate reasons, standing alone, would have induced the employer to take the same adverse action.'" *Id.* . . . "To prevail on summary judgment, the employer must [ ] establish not just that it had a legitimate basis for taking the adverse employment action, but as a matter of uncontroverted fact that it would have taken the adverse employment action regardless of the employee's military status." *Id.* at 787 (citing *Leisek v. Brightwood Corp*., 278 F.3d 895, 900 (9th Cir.2002)).

*Otero,* 640 F. Supp.2d at 1351-52.  Subsequent to the *Otero* decision, the United States Supreme

Court decided *Staub v. Proctor Hosp.,* --- U.S. ---, 131 S.Ct. 1186, 1187 (2011), in which the

majority held:

> If a supervisor performs an act motivated by antimilitary animus that is intended
> by the supervisor to cause an adverse employment action, and if that act is a
> proximate cause of the ultimate employment action, then the employer is liable
> under USERRA.

*Staub,* 131 S.Ct. at 1187.  The Court does not believe that *Staub* signals a departure from the

standard described in *Otero.*  *Staub* was concerned with a very narrow issue addressing the

meaning of "motivating factor" in a situation where the official who imposes the adverse

employment action is not motivated by any discriminatory animus, but where that action was

influenced by previous company action which *is* the product of a discriminatory animus.[8]

The Court recognizes that neither *Otero* nor *Lewis* are published cases.  However, the

Tenth Circuit has observed the paucity of precedent on the analysis of USERRA claims.  *Lewis,*

217 Fed. App'x at 786.  It also noted that the legislative history expressed an intent "to employ

the evidentiary scheme for cases arising under the National Labor Relations Act . . . ."  *Id.*  This

is exactly the analytical framework utilized in *Otero.*  Further, the standard used in *Otero*  is

faithful to the elements set forth in USERRA's statutory text.  Thus, because the Court is

satisfied that *Otero* is consistent with relevant precedent regarding USERRA claims, that

standard will be applied here:  Plaintiff must prove by a preponderance of the evidence that his

military service was a substantial or motivating factor in the adverse employment action, and if

---

[8]   The majority opinion held that discriminatory animus need not be shown by the decisionmaker, as long as an
earlier agent intended for the consequences of that act occur.  The majority felt that this standard prevented an
employer from shielding himself by having a personnel official carry out the adverse action.  131 S.Ct. at 1193.
However, the concurrence disagreed with the majority holding that "it was enough for an employee to show that
"discrimination motivated *some other* action and that this latter action . . .  caused the termination decision."  *Id.* at
1195 (Alito and Thomas, JJ., concurring) (emphasis in original).  The concurrence pointed out that the potential for
the "rubberstamping" of discriminatory actions could instead  be addressed with an inquiry into whether an official
with discriminatory motive delegates the adverse decisionmaking.  *Id.*

he does so, the burden then shifts to the employer to prove the affirmative defense that legitimate reasons, standing alone, would have induced the employer to take the same adverse action.

**V.      Analysis—Plaintiff's USERRA Claim of Discrimination**

The burden is on the employee making a USERRA claim to show his military service was "a substantial or motivating factor in the adverse employment action." *Sheehan v. Dep't of Navy,* 240 F.3d 1009, 1013 (Fed. Cir. 2001) (internal quotation marks omitted). *Durant v. Miller Coors, LLC*, 415 Fed. App'x 927, 930 (10th Cir. 2011). Thus, Plaintiff must show evidence which infers treatment resulting from anti-military motivation.

A.      No Evidence of Anti-Military Motive

Plaintiff's claim of discrimination begins with his alleged differential treatment in the October 25, 2011 recertification class and ends with his termination. In light of the undisputed facts which have been carefully set out, above, Plaintiff's USERRA claim is painfully short of any merit.

In his deposition, Plaintiff stated that when he walked into October 25, 2011 class, Sergeant Vigil, who was in charge of the class, said "Oh, good, and here comes our victim for the day." Ex. C at 57-58. Plaintiff's understanding was that only the supervisors got exposed to chemical agents. The supervisors who attended the class stood in a line and were sprayed with a fogger containing OC. The supervisors completed recertification by walking through a wall of chemical agent. Ex. C at 57:13-25; 58:1-2. After the supervisors were done, Sergeant Vigil turned to Plaintiff and said, "Okay, and we need to spray you now." When Plaintiff asked why, Sergeant Vigil said, "Well, you didn't complete this in the academy." Ex. C at 58:1-4.

There is no evidence from which to infer a basis for USERRA discrimination based on Plaintiff's treatment during the October 25th class. First, Plaintiff offers no facts to suggest that

requiring him to undergo Level I exposure during that class was decided arbitrarily.  Plaintiff

offers no evidence or testimony to dispute the following: that passing the chemical exposure

portion of the training is mandatory; that Plaintiff did not complete handcuff portion of the

chemical exposure training while in the academy; that he attended the October 25, 2011

recertification class but refused to undergo Level I exposure; that he needed to make up that class

in order not to face disciplinary action; and that he did not show up for the class scheduled on

October 28th in order to avoid disciplinary action.  It is also undisputed that Levels II and III

exposure were reserved to recertify supervisors who carried OC on the job and who had already

completed the Level I drill.  Plaintiff offers no facts at all from which one could infer that being

required to go through Level I exposure at the October 25th class was targeting him in any way,

or that it involved discriminatory motive.

   Second, based on the overwhelming evidence, including, Plaintiff's own statements, there

is no evidence that any of his supervisors or peers held negative views about Plaintiff's

intentions to join the military:

> Q.    **Did anyone attempt to discourage you from enlisting in the Army?**
> A.    At the jail or –
> Q.    Yes
> A.    - Just in general?
> Q.    At Santa Fe County.  How's that?
> A.    **No.**

Ex. C at 91:14-20 (emphasis added).  Indeed, Plaintiff himself concedes that his claim is based

on mere speculation:

> Q.    . . . did anyone at the county, specifically your supervisors, you know, maybe
> higher than you, say anything that made you believe that they would want to terminate
> you because you had enlisted?
> A.    No.
> Q.    Are you **assuming** that's what happed?
> A.    Yes.

Ex. C at 97:22-25; at 98:1-4 (emphasis added).

At his deposition, Plaintiff was asked if there was any reason, other than being required to undergo Level I exposure during the October 25th class, which made Plaintiff feel he was being "singled out":

> Q.      Was there any other reason that you thought that they were singling you out?
> A.      I didn't know why they would be singling me out.  I mean, I had—**the only thing that I could think of was that they were mad because I was going to be leaving to the Army.**
> Q.      Who would be mad?
> A.      Them in general, because I hadn't been there very long, the jail.
> Q.      **Well, anybody in particular**?
> A.      In particular?
> Q.      Yes.
> A.      **No.**

Ex. C at 62:4-16 (emphasis added).  Incredibly, Plaintiff attributes discriminatory motive to the same individuals whom he claims were actually encouraging him to enlist, and admits he is alleging discrimination because he can't think of any other reason why he was fired:

> Q.      . . . So you're saying that somebody or multiple people decided that, because you were enlisting in the Army, you shouldn't work at Santa Fe County.
> A.      Yes
> Q.      Isn't that what your lawsuit is about?
> A.      Yes.
> Q.      Who do you say had that motivation?
> A.      Major Woulard, Sergeant Valdez, Sergeant Vigil.
> Q.      **Well, those are some of the people that you said were encouraging to you.**
> A.      At first.  There's no other reason for my termination. I—
> Q.      There's no other reason that you can think of.
> A.      There's no other reason.

Ex. C at 98:8-24.

Most of Plaintiff's supervisors knew of Plaintiff's plan to enlist.  Plaintiff offers no evidence that any of these individuals either discouraged him from enlisting or showed anti-military sentiment.  Plaintiff received his formal enlistment papers on October 24, 2011.  Ex. C

17

at 94:1-4.  Plaintiff does not recall exactly who he told about his acceptance into the Army, but

mentions various supervisors knew, including Lieutenant Ellis and Major Woulard.  Ex. C at 94-

95, 99.  Plaintiff was asked what reaction he got from these individuals:

> Q.      And what reaction did you get, if any?
> A.      They just said, "Good."  **They were all happy for me.**

Ex. C at 95:21-22 (emphasis added).  Lieutenant Ellis knew about Plaintiff's intention to enlist

within weeks of Plaintiff's visit to the recruiter.  Ex. C at 89:11-12.  He told Plaintiff that joining

the military would "be good" for him and that "everybody should go into the military."  Ex. C at

77:1-11.  Lieutenant Ellis also discussed with Plaintiff the various types of jobs available in the

military and gave him advice about some of the specialty areas open to him in the service.  Ex. C

at 89-90; Ex. D at 57.

Plaintiff stated that many of his superiors had been in the military.  Ex. C at 77-78.  Both

Lieutenant Ellis and Sergeant Valdez were former military.  Lieutenant Ellis was in the Reserves

at the time Plaintiff knew him, and Sergeant Valdez had mentioned to Plaintiff that he planned to

go back into service.  Ex. C at 80:9-19.  Major Woulard worked in Afghanistan in the jail, but as

a civilian.  Ex. C at 80:1-4.  Plaintiff stated that Major Woulard would have known about his

intent to enlist, although he could not say for sure.  Ex. C at 99-100.  There is certainly no

evidence of any discouragement or negative feedback Plaintiff received from Major Woulard.

On the other hand, there is evidence that Major Woulard was instrumental in giving Plaintiff a

chance to make up his failure to complete the October 25th class.  Ex. D at 33.

Plaintiff also presents no evidence suggesting that the county or detention facility where

he was employed had a policy disfavoring individuals who were on military duty.  Plaintiff was

not aware of any policy manual containing information about employees going into military

service.  Ex. C at 81.  However, Defendants present Lieutenant Ellis' testimony that the duty

roster at the corrections facility was arranged to allow for times when individuals might not be available for duty for military obligations.  Ex. D at 60-61.

Plaintiff's testimony can be summed up thus: he admits that his assertions of discrimination are mere assumptions on his part, and he cannot identify a single individual who showed discriminatory intent or tendency by word or action.  Plaintiff also stated that everyone with whom he discussed his interest in enlisting in the military responded in a positive and encouraging way without exception, including his supervisors, several of whom have a military background.  There is not one individual who Plaintiff can identify as exhibiting negative feelings about his plans to enlist in the Army.

      B.    <u>Defendant's Legitimate Reasons for Termination</u>

Even if the Plaintiff was able to meet his initial burden of presenting facts from which one could infer discriminatory motive, his USERRA claim would ultimately fail because Defendants offer overwhelming evidence of legitimate reasons for terminating Plaintiff.

Plaintiff did not complete the chemical exposure class in training, and he could have been "washed out" of the program at that point (Ex. 3 at 18).  Instead, Plaintiff was afforded an opportunity to be re-tested, while working as a corrections officer.  At the October 25th class, Sergeant Valdez told Plaintiff that he was required to undergo direct exposure because he had never completed the Level I exposure during training.  Instead, Plaintiff made the decision to refuse to be exposed to the chemical at the class, accusing Major Woulard and Sergeant Valdez with "putting [him] on display."  Ex. C at 58:24-25.

After Plaintiff's refusal to participate in the October 25th class, Plaintiff faced disciplinary action for not completing the October 25th class, but Lieutenant Ellis spoke with Major Woulard who agreed to give Plaintiff a chance to make up the session instead of writing

him up.  Ex. D at 33:15-20.  The makeup session was scheduled for October 28 in the early

afternoon.  Ex. D at 56:1-8.  Lieutenant Ellis recalled that he had discussions with Plaintiff

regarding the need to complete this class ("Without lack of a [sic] better words, just kind of like,

'Suck it up.'").  Ex. 3 at 27:1-3.  Lieutenant Ellis also cautioned Plaintiff that the makeup class

would be "more difficult" because it was scheduled on a work day.  Ex. D at 33:6-8.  Plaintiff

was scheduled to work 6 p.m. to 6 a.m. on the day of the test, was kept overtime until 10:00, and

decided to return home to get some sleep instead of remaining at the facility to take the test.

       Plaintiff does not dispute that he was a probationary employee, which meant that he

could be terminated without cause or advance notice at any time.  Exs. A, B.  Plaintiff failed to

complete a mandatory portion of his training despite being asked to do so by a superior officer,

Sergeant Vigil, on October 25th.  He was subsequently told by another superior officer,

Lieutenant Ellis, after October 25th that he had to participate in the exposure drill in order to

complete his training.  Defendants' position is that there was no obligation to retain an individual

who was not willing to pass the mandatory requirements.  The Court finds that this position is

supported by the undisputed facts and the overwhelming evidence, and further finds that

Defendants' reasons given for the termination are clearly legitimate and reasonable.

       Plaintiff offers no evidence or testimony indicating that any of the reasons given by

Defendants are pretextual for anti-military motivation.  He fails to reveal any weaknesses,

implausibility, inconsistencies, incoherencies, or contradictions in the actions taken by

Defendants, either by requiring him to complete the chemical exposure training, or in

terminating him.  *See Annett v. Univ. of Kansas,* 371 F.3d 1233, 1242 (10th Cir. 2004) (mere

conjecture that the University acted with discriminatory reasons will not suffice to establish

pretext).  The Court agrees with Defendants that Plaintiff cannot overcome the legitimate

nondiscriminatory reason for the termination – his failure to complete his training requirements. Defendants knew of Plaintiff's intentions to join the Army prior to the time Plaintiff was sworn in.  Plaintiff failed to complete the initial chemical exposure training, and yet he was sworn in and allowed to assume his duties as a corrections officer, while being given two other opportunities to complete the course.  The record is clear that Plaintiff's co-workers and supervisors encouraged him in his decision to enlist.  Defendants did not terminate Plaintiff until he failed to complete the exposure training for the third time.  These are not the actions of an entity or individuals with anti-military motives.  Accordingly, Defendants have presented sufficient evidence to prove their affirmative defense that there were legitimate reasons, standing alone, for terminating Plaintiff.

Plaintiff also attempts to invoke a "cat's paw" theory of liability, based on the letter requesting his termination, and the termination letter.  Exs. G, H.[9]  Plaintiff concedes that neither the Director of Corrections, Annabelle Romero ("Romero"), nor the County Manager, Katherine Miller ("Miller"), had any reason to know about Plaintiff's intent to enter the military.  However, Plaintiff claims that these two individuals relied on others who had illegal motivation to end his employment because of his intent to enlist.

Illegal motive need not be shown by the decisionmaker, as long as an earlier agent intended for the consequences of that act occur.  *Staub,* 131 S.Ct. at 1192.  In this case, there is evidence to suggest that Romero and/or Miller relied on information provided by others to

---

[9]  The "cat's paw" theory of liability refers to an employee who seeks to hold his employer liable for the animus of a supervisor who was not charged with making the ultimate employment decision.  In *Staub,* the Supreme Court explains that the origin of this theory is derived from an Aesop's fable:

> In the fable, a monkey induces a cat by flattery to extract roasting chestnuts from the fire.  After the cat has done so, burning its paws in the process, the monkey makes off with the chestnuts and leaves the cat with nothing.  A coda to the fable (relevant only marginally, if at all, to employment law) observes that the cat is similar to princes who, flattered by the king, perform services on the king's behalf and receive no reward.

131 S.Ct. at 1190, n.1.

support their decision to terminate Plaintiff, namely, Sergeant Valdez and the Warden David

Trujillo.  The cat's paw theory does not apply here, however, because there is no evidence of

anti-military motive on the part of Sergeant Valdez, the Warden, or anyone else who was in a

position to influence Romero or Miller in making the decision to terminate Plaintiff, or in issuing

the letter of termination.  Plaintiff admits that Sergeant Valdez encouraged him in his endeavors

to pursue enlistment in the military, and there is no mention anywhere of conversations Plaintiff

had with the Warden relating to his interest in the military.

Plaintiff fails to present any dispute of fact to suggest that Defendants would not have

fired him had he not intended to enlist, and thus Defendants are entitled to summary judgment on

Plaintiff's claim of discrimination under USERRA.

## VI.    Analysis—Plaintiff's USERRA Claim of Retaliation

Plaintiff contends that Defendants retaliated against him by terminating him nine days

after he received his formal enlistment papers on October 24, 2011.  By defining the "protected

activity" in his retaliation claim as receiving his formal enlistment papers, Plaintiff succeeds in

establishing a close temporal proximity between this protected activity and his termination.  A

nine day period is sufficiently close in time to establish a prima facie case of retaliation. *Hinds v.*

*Sprint/United Management Co*., 523 F.3d 1187, 1204 (10th Cir 2008) (close period of time

between protected activity and adverse action alone raises an inference of illegal motive).

However, a prima facie showing is not onerous, and a plaintiff asserting a retaliation

claim retains the "ultimate burden of persuasion to demonstrate that the challenged employment

decision was the result of intentional retaliation."  *Gunnell v. Utah Valley State College,* 152

F.3d 1253, 1262 (10th Cir. 1998).  Plaintiff in this case has nothing more than temporal

proximity to rely on for his claim of retaliation.  This is not enough to establish retaliatory

motive, to create a dispute of fact inferring anti-military motive on the part of Defendants, or to withstand summary judgment. *See Pastran v. K-Mart Corp.,* 210 F.3d 1201, 1206 (10th Cir. 2000) (temporal proximity between an employee's protected conduct and an adverse employment action "is not sufficient by itself to raise an issue of fact regarding pretext"). The Court has already found that, viewing the facts favorably to Plaintiff, there is no evidence or testimony that any of the Defendants exhibited anything other than encouragement for Plaintiff's decision to enlist in the Army. The Court has also conducted a review of Defendants' proffered reasons for terminating Plaintiff, and has found no facts which a reasonable fact finder could consider pretextual. Plaintiff's claim of discriminatory motive is, by his own statements, mere assumption on his part, and conjecture or assumption alone is insufficient for a claim of retaliation. *Annett v. University of Kansas*, 371 F.3d 1233, 1242 (10th Cir. 2004) (mere conjecture that the University acted with discriminatory reasons will not suffice to establish pretext). Therefore, Defendants are entitled to summary judgment on Plaintiff's retaliation claim under USERRA.

   Defendants offer another view of Plaintiff's retaliation claim, one that defines the "protected activity" as Plaintiff's communication of his intention to enlist in the Army, which occurred in April of May of 2011 while still in training. [10] Ex. C at 76-77. Under this view, with the "protected activity" occurring about five months prior to his termination, Plaintiff cannot create a temporal proximity close enough for a prima facie case. *See MacKenzie v. Denver, City and Cnty.*, 414 F.3d 1266 (10th Cir. 2005) (a six-week period between protected activity and adverse action may be sufficient, standing alone, to show causation, but a three-month period, standing alone, is insufficient).

---

[10] USERRA prohibits discrimination based on an individual's "application for service" in the military. 38 U.S.C. §4311(a); (c)(1).

The Court has ruled that Plaintiff's retaliation claim fails based on his definition of "protected activity" as receiving his formal enlistment papers.  However, because it is undisputed that Plaintiff's co-workers and supervisors knew of these intentions before Plaintiff started his duties as a corrections officer, it makes much more sense to consider Plaintiff's earlier communications of his intentions to enlist as the "protected activity."  Obviously, Plaintiff selected the date he received his enlistment papers as the date of "protected activity" in order to create a closer temporal proximity to his termination, and therefore, a prima facie case.  Under either scenario, Plaintiff's retaliation claim fails, only at different points in the analysis.

## CONCLUSION

In sum, the Court finds and concludes that:

(1) Plaintiff does not present any facts from which a reasonable fact finder could infer anti-military motive on the part of any Defendant;

(2) Plaintiff fails to present evidence of pretext in the face of the overwhelming evidence indicating that he was terminated because he failed to complete the requirements for his job;

(3)  Plaintiff fails to present any facts which suggest that his plans to enlist was a motivating factor in his termination; and also fails to present evidence from which a reasonable fact finder could infer that Defendants would not have terminated him if he had not intended to enlist or had not enlisted in the military; and

(4)  even if Plaintiff has shown a prima face case of retaliation based on the temporal proximity of his formal enlistment and his termination, Plaintiff fails to show evidence of pretext beyond the temporal proximity.

Finally, the Court feels compelled to comment on Plaintiff's presentation of his case.  In his sworn deposition, Plaintiff repeatedly confirmed that the same individuals he was suing in

this case under USERRA had shown only enthusiasm for his intention to join the Army. More than once, Plaintiff conceded that he could not identify a single individual who had exhibited anti-military motives, and yet insisted that he was fired because he was planning to enlist. Plaintiff appears to misunderstand the importance of presenting *evidence* of discrimination when one alleges such a claim, rather than just assuming that discrimination existed. In this case, Plaintiff has presented not one shred of evidence of anti-military disapproval or resentment.

At one point in his deposition, Plaintiff expressed his surprise at being terminated, since he "was never in trouble for any reason." Ex. C at 99:3-4. He stated that he signed the paperwork to join the Army and "they suddenly want to spray me with mace. They suddenly want to fire me. Just all of a sudden out of the blue one day." Ex. C at 99:8-11. The Court is equally surprised that an individual who is on probationary status and has failed to complete— not once, but three times—a core and mandatory requirement in his training, after being advised more than once that he needs to complete this requirement, can nevertheless claim that he is caught off guard when he is terminated.[11]

For these reasons, Plaintiff should not be surprised that the Court finds in favor of Defendants on all of his claims.

**THEREFORE,**

**IT IS ORDERED**  that Defendants' Motion for Summary Judgment (**Doc. 37**) is hereby GRANTED for reasons described in this Memorandum Opinion and Order;

**IT IS FURTHER ORDERED**  that Plaintiff's Motion for Leave to File Surreply (**Doc. 49**) is hereby DENIED for reasons described in this Memorandum Opinion and Order.

---

[11]  Plaintiff's insistence that he did complete the chemical exposure drill while in training is not borne out by the facts and is not subject to dispute, as the Court noted above in the factual narrative portion.

A separate Rule 58 Judgment will be entered separately.


_____
UNITED STATES DISTRICT JUDGE